UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT N. JAMES,                    :
                                    :   NO. 1:09-CV-00839
      Plaintiff,                    :
                                    :   **OPINION AND ORDER**
                                    :
      v.                            :
                                    :
                                    :
OHIO DNR OFFICER JAMES              :
TUNNELL, et al.,                    :
                                    :
      Defendants.                   :
                                    :
                                    :

     This matter is before the Court on Defendant Daron
Rhoads' Motion for Summary Judgment (doc. 43); Defendant James
Tunnell's Motion for Summary Judgment (doc. 53); Plaintiff's
Memoranda in Opposition (docs. 51, 59, respectively); and each
Defendant's Reply (docs. 52, 63). For the reasons stated herein,
the Court GRANTS Defendant Rhoads' Motion for Summary Judgment
(doc. 43), and GRANTS Defendant Tunnell's Motion for Summary
Judgment (doc. 53).

I.        **Background**

     The following facts come from Defendants' Motions,
Plaintiff's Responses, and the relevant exhibits, including the
"entry and exit" video recorded by Defendant James Tunnell
("Tunnell") and other officers, each of which the Court closely
reviewed in its entirety.

Defendant Daron Rhoads ("Rhoads"), a deputy for the Butler County Sheriff's Office, was on road patrol near Okeana, Ohio, when Plaintiff Robert James' ("James") truck passed on November 13, 2007 (doc. 43).  The Butler County Sheriff's Office had received prior complaints that James kept guns in his vehicles and was also involved in illegal poaching activities (<u>Id</u>.). Accordingly, Rhoads followed the truck and, at approximately 6:05 P.M., executed a traffic stop during which he cited James for a left of center traffic violation (<u>Id</u>.).  Rhoads called for back-up after his initial approach of the drivers' side of the truck for two reasons: James' truck had particularly high tires and tinted windows that made it hard to see into the truck, and James did not fully roll his window down when providing Rhoads with his licence and registration (<u>Id.</u>).

After back-up arrived, Rhoads approached the drivers' side of James' truck again (<u>Id.</u>).  At this time, James admitted that he had two loaded rifles in the front seat and claimed that one of them was jammed (<u>Id</u>.).  Rhoads asked James to exit the vehicle, and James cooperated (<u>Id</u>.).  Rhoads cleared the weapons of ammunition and secured the guns for safety reasons (<u>Id</u>.). Subsequently, Rhoads placed James under arrest for the improper handling of firearms in a vehicle (<u>Id.</u>).  At 6:20 P.M., after Rhoads found and secured the guns, Rhoads handcuffed James by placing James' wrists behind his back and placing James in the rear

seat of the cruiser (Id.).  James did not complain when Rhoads initially handcuffed him (Id.).

Rhoads proceeded to ask dispatch to contact the Ohio Department of Natural Resources ("ODNR") because Rhoads knew about the previous complaints the ODNR had received regarding James' potential involvement in poaching (Id.).  Subsequently, an ODNR supervisor called ODNR Officer Tunnell to respond to Rhoads' dispatch call in order to investigate James' possible wildlife law violations (doc. 53).  James was seated in the back of Rhoads' cruiser when Tunnell arrived around 8:30 P.M. (doc. 43).  Tunnell asked Rhoads to remain with James at the scene of the traffic stop while ODNR investigated (Id.).

The ODNR officers conducted their roadside investigation interviewing James and reviewing evidence obtained from James' vehicle (doc. 53). Tunnell and other ODNR officers searched James' vehicle and found gloves that contained deer hair and deer hair in the truck bed in addition to the loaded weapons which Rhoads previously discovered (Id.).  Rhoads did not transport James to Butler County Jail until the ODNR investigators completed their investigation and released the scene to Rhoads, which took place around 11:00 P.M. (doc. 43).

James alleges that his arms started tingling and his hands became numb around 8:00 P.M., but admits that he had not made any complaints before this time about the handcuffs (Id.).  James

-3-

contends that around 8:00 P.M. he asked Rhoads to loosen his handcuffs five or six times before Rhoads removed James from the cruiser, removed the handcuffs, and repositioned the handcuffs in front of James for comfort (<u>Id.</u>).  Later, Rhoads replaced the handcuffs behind James' back for transportation to jail (<u>Id.</u>). James made no further complaints to Rhoads about the handcuffs (<u>Id.</u>).  Around 11:00 P.M., Butler County Jail personnel took custody of James from Rhoads, booked James into the jail, and removed the handcuffs (<u>Id.</u>).  At that time, James was no longer in Rhoads' custody, and Rhoads left (<u>Id.</u>).

James did not request medical attention, complain of any injury, or show his wrists to anyone at the jail during his time there (<u>Id.</u>).  James refused to answer questions which jail personnel asked him regarding any injuries (<u>Id.</u>).  Moreover, the booking report which James signed did not include indications of injuries to James' wrists, shoulder, or back or a request by James for medical attention (<u>Id.</u>).

After James' release from jail, he did not seek medical treatment for his wrists (<u>Id.</u>).  However, James believed that he suffered shoulder and upper back pain from the handcuffing (<u>Id.</u>). However, he did not make any complaints to jail personnel about any shoulder or back pain (<u>Id.</u>).  His first treatment for any shoulder or back pain was two months after the traffic stop, at the end of January 2008 (<u>Id.</u>).  During his treatment in 2008, James did not

tell his doctor or chiropractors about the handcuffing, and no medical doctor or chiropractor told James that any shoulder or back pain was related to the handcuffing (Id.)

After the ODNR roadside investigation took place, Tunnell requested James' consent to search James' house for untagged deer parts, but James refused (doc. 53). Consequently, Tunnell obtained a search warrant to search James' residence (Id.). The warrant provided for the search and seizure of, inter alia, fired rifle bullets, untagged or fraudulently tagged deer or deer parts, hunting related photographs, including CDs and DVDs, and hunting related videos (Id.). Tunnell, other ODNR officers, and Butler County Sheriff Deputies proceeded to execute the warrant early on the morning of November 14, 2007 (Id.).

Tunnell filmed an "entry video" depicting the conditions inside the residence when the officers entered (Id.). Tunnell observed a large number of deer, other game mounts, and animal parts located in multiple areas throughout James' house during the officers' initial search (Id.). Tunnel noted that some of the deer and turkey parts were legally tagged while other parts were not (Id.). Tunnell further observed that when the officers entered the residence, some of the mounts had decorations, such as Christmas lights, a hat, and goggles (Id). Eventually, the officers located and filmed their inspection of several gun safes (Id.).

During the search of James' gun safes, the officers

-5-

removed what at the time appeared to be a .30 caliber machine gun from a safe, but failed to replace the weapon back in the safe (Id.). However, Tunnell recalls that the officers attempted to place the safes' contents back into their original positions (Id.). Furthermore, Tunnell and other officers identified and inventoried a large number of animal mounts and parts that were taken as evidence and logged in the warrant inventory (Id.). Tunnell did not examine any of James' videos but asked the other officers to do so (Id.). The officers completed the documentation of the inventory of evidence and ODNR Officer Ireland conducted an "exit video" of the residence as the officers completed their search (Id.). Upon Tunnell's exit of the residence, he affixed a copy of the warrant paperwork to the pull chain of a light above a table in the kitchen area to ensure that James could easily find the paperwork when he arrived home (Id.).

James pleaded guilty to a reduced misdemeanor offense regarding the rifles he transported in his truck and was fined and sentenced to 30-days probation (Id.). With respect to the deer tag investigation, Tunnell filed deer-tag charges, which were dismissed because James ultimately provided the state with relevant tags (Id.).

## II.     Procedural Posture

After the Court granted Rhoads' Motion for Partial Judgment on the Pleadings, (doc. 27), James has only one remaining

claim against Rhoads: a claim for excessive use of force allegedly in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments (doc. 43).  Likewise, after the Court partially granted Tunnell's Motion to Dismiss, (doc. 27), James has only one remaining claim against Tunnell: a claim for an unreasonable search and seizure that violated James' constitutional rights (doc. 53). Both Rhoads and Tunnell have filed Motions for Summary Judgment (docs. 43, 53 respectively), which are ripe for the Court's consideration.

III.    **Legal Standard**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs</u>., 979 F.2d 1131, 1133 (6th Cir. 1992)(per curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Patton v. Bearden</u>, 8

F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)(internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. 317; Anderson v.

Liberty Lobby, Inc., 477 U.S. 242 (1986).  As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).  Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994).  Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-40 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989)(internal quotation marks omitted).  In contrast, mere

conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F .2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc., 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

**IV.      Discussion**

    **A.   Defendant Rhoads' Motion for Summary Judgment**

James brings this action pursuant to 42 U.S.C. § 1983, alleging that Rhoads' actions violated James' Fourth and Fourteenth Amendment rights to be free of excessive force regarding Rhoads' use of handcuffs on James on November 13, 2007 (doc. 43). Summary Judgment is appropriate at this time because qualified immunity

-10-

shields Rhoads.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity serves to permit the resolution of many insubstantial claims at the summary judgment stage, in order to avoid excessive disruption of government. Id. Moreover, qualified immunity is not merely a defense against liability to be asserted during litigation, but rather offers an entitlement not to stand trial or face other burdens of litigation. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. Jones v. City of Cincinnati, 521 F.3d 555, 559 (6th Cir. 2008) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). A constitutional right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635 (1987). Thus, the relevant dispositive

inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Saucier, 533 U.S. at 202; Morrison v. Bd. of Trustees, Green Township, 583 F.3d 394, 401 (6th Cir. 2009).

### 1.    Fourteenth Amendment Claim

As noted above, James brings this claim pursuant to 42 U.S.C. § 1983 alleging that Rhoads violated James' constitutional right to be free from excessive force.  In cases where the plaintiff alleges that law enforcement officials used excessive force during an arrest, the claim is analyzed under the Fourth Amendment's reasonableness standard rather than general due process protections under the Fourteenth Amendment. Graham v. Connor, 490 U.S. 386, 396-97 (1989); Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001).  Accordingly, James' claims are appropriately analyzed under a Fourth Amendment, not a Fourteenth Amendment, rubric.

### 2.    Fourth Amendment Claim

James fails to establish that Rhoads violated James' Fourth Amendment right to be free from excessive force.  Under the Fourth Amendment, individuals have a right to be free from excessive or unreasonable force when police make an arrest or seizure. Graham, 490 U.S. at 394-95.  One such Fourth Amendment right is the right to be free of unduly tight or excessively

forceful handcuffing during the course of a seizure. <u>Morrison</u>, 583 F.3d 401; <u>Kostrzewa</u>, 247 F.3d at 639. Using an "objective reasonableness" standard, the inquiry becomes whether an officer has exerted excessive force during the course of a seizure. <u>Kostrzewa</u>, 247 F.3d at 639. Such a determination entails "balanc[ing] the consequences to the individual against the government's interests in effecting the seizure." <u>Burchett v. Kiefer</u>, 310 F.3d 937, 944 (6th Cir. 2002)(citing <u>Graham</u>, 490 U.S. at 396). A court should judge the lawfulness of the conduct from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Kostrzewa</u>, 247 F.3d at 639 (quoting <u>Graham</u>, 490 U.S. at 396).

Although the Fourth Amendment prohibits unduly tight handcuffing in the course of an arrest, the Sixth Circuit recognizes that not all allegations of tight handcuffing amount to excessive force. <u>Lyons v. Xenia</u>, 417 F.3d 565, 575 (6th Cir. 2005). Instead, in order for a handcuffing claim to survive summary judgment, the plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he complained the handcuffs were too tight; (2) the officers ignored the plaintiff's complaints that the handcuffs were too tight; and (3) the plaintiff experienced some physical injury resulting from the handcuffing. <u>Miller v. Sanilac County</u>, 606 F.3d 240, 252 n.8 (6th Cir. 2010)(citing <u>Lyons</u>, 417 F. 3d at 575-76).

-13-

An immediate loosening of the handcuffs by a deputy is not constitutionally required. Miller, 606 F.3d 240, 252 n.8 (6th Cir. 2010)(ruling a non-immediate response by an officer to loosen plaintiff's handcuffs was not an automatic constitutional violation of plaintiff's rights).  In Miller, the Sixth Circuit ruled that it can hardly be construed to mean that any longer response, to a plaintiff's request for a loosening of his or her handcuffs, than an immediate response, is an automatic constitutional violation. Id.  In fact, Sixth Circuit precedents fail to notify officers that any response to a complaint of tight handcuffing other than an immediate response constitutes excessive force.  Fettes v. Hendershot, Case No. 08-4419, 2010WL1687727, slip op. at *5 (6th Cir. Apr. 27, 2010).

Additionally, the use of too tight handcuffs does not involve excessive force where the plaintiff does not initially complain about the handcuffs, and when the plaintiff does complain, the officers immediately respond.  See Burchett, 310 F.3d at 944-45 (rejecting plaintiff's excessive force claim as a matter of law when officers left him tightly handcuffed in cruiser for three hours while executing a search warrant).  Moreover, a reasonable officer could not know a problem existed where a plaintiff makes no complaints of injuries due to a plaintiff's handcuffs.  Lyons, 417 F. 3d at 575-76.

In this case, and in light of James' admissions, James

-14-

fails to allege sufficient facts to show that Rhoads violated James' constitutional rights under the objective reasonableness standard set forth in Kostrzewa.  The circumstances surrounding James' arrest warranted the use of handcuffs. The length of James' detention and handcuffing was based upon reasonable requests of law enforcement personnel including: (1) Rhoads' duties as a Butler County officer in the traffic violation, his on-site investigation, and his interview of James based on the evidence of firearms and potential hunting violations found during the traffic stop and (2) the ODNR's request that Rhoads stay with James until the ODNR investigation was complete (doc. 43).  Thus, the presence of the two loaded rifles found in James' truck and the forthcoming arrest more than justified the use of handcuffs.

With respect to the three prong analysis set forth in Lyons that enumerates the requirements for a plaintiff's handcuffing claim to survive summary judgment, Miller 606 F.3d at 242 (citing Lyons, 417 F.3d at 575-76), James proves the first prong: that James complained the handcuffs were too tight (doc. 43).

However, James fails to meet the second prong, namely that Rhoads ignored James' complaints that the handcuffs were too tight.  Rhoads attempted to mitigate James' alleged pain resulting from the tightness of the handcuffs during the investigation (Id.). James admits that he did not complain to Rhoads about the handcuffs

-15-

until approximately one and a half hours after Rhoads initially handcuffed James (Id.). According to James' testimony, Rhoads did not ignore James' first complaint that the handcuffs were too tight (Id.). In fact, the parties agree that at some point Rhoads responded to James' complaints and placed the handcuffs in front of James for James' comfort (docs. 43, 51). Here, as in Miller, the law does not require that an officer immediately loosen handcuffs upon a plaintiff's complaint. 606 F.3d 240. The facts corroborate that Rhoads did not ignore James' complaints about the tightness of handcuffs, but acted upon such complaints and loosened the handcuffs accordingly (docs. 43, 51).

James' Memorandum Opposing Summary Judgment suggests that Rhoads violated the Constitution because Rhoads should have known that James was in pain (doc. 51). However, James' argument misapplies the standard for denying qualified immunity. The test is whether an officer's use of force is objectively unreasonable. See Graham 490 U.S. at 397; Lyons, 417 F.3d at 575-76. In Lyons, the court found that the plaintiff's allegation of excessive force from tight handcuffing did not rise to the level of a constitutional violation because the plaintiff had not complained of her pain to the officers. 417 F.3d at 576. There, the court noted that in the absence of an obvious physical problem created by the handcuffs, it is fair to question how a reasonable officer should have known that a problem had occurred due to the

-16-

handcuffing. Id.  In this case, it is objectively reasonable that Rhoads did not know of James' pain because James did not complain about the handcuffs after Rhoads repositioned the handcuffs in front of James' body or when Rhoads replaced the handcuffs behind James' back to ensure a safe transport to jail (doc. 51).  Rhoads could not reasonably know any further problems existed if James did not tell Rhoads of such problems (doc. 43).

James also fails to meet the third prong of the Lyons standard: that James experienced some physical injury resulting from the handcuffing.  See Miller 606 F.3d at 242 (citing Lyons, 417 F.3d at 575-76).  The booking report, created at the Butler County Jail and signed by James, does not indicate that James' wrists or any other body parts were injured during the course of his arrest, investigation, or time at jail (doc. 43).  The report does indicate that James did not request medical attention while at jail, immediately after he experienced the allegedly excessive handcuffing (Id.).  Moreover, James (1) did not receive medical treatment for his wrists after his release from jail; (2) did not complain to officers or jail officials of pain in James' shoulder or back; and (3) did not tell his doctor or chiropractor about the handcuffing when receiving treatment for shoulder and back pain (Id.).  James lacks any medical evidence to support a causal connection between his alleged shoulder and back pain and his handcuffing on November 13, 2007.  Thus, James fails to satisfy the

-17-

third prong of the standard set forth in Lyons because James' booking report and medical records do not support his claims of injuries that allegedly resulted due to the handcuffing.

James fails to establish that Rhoads violated James' constitutional rights, because the second and third prongs of the Lyons excessive force analysis are not satisfied.  See Morrison, 583 F.3d at 402 (ruling physical injury could be a genuine issue of fact because plaintiff had satisfied the first two prongs of the test for excessive force in handcuffing); Lyons, 417 F.3d at 576 (explaining that plaintiff must demonstrate both that officers ignored plaintiff's complaints and that plaintiff suffered physical injury); Burchett, 310 F.3d at 917 (holding no claim for excessive force because plaintiff did not initially complain of pain from handcuffs and officers responded once plaintiff did complain).  In the absence of an obvious physical problem or injury caused by the handcuffs, or ignored pleas from James to loosen the handcuffs, it is fair to ask how Rhoads, acting as a reasonable officer, should have known that a injury had occurred.

Accordingly, James fails to create a genuine issue of material fact as to whether Rhoads violated James' Fourth Amendment rights.  The facts at hand do not rise to the level of unconstitutionally excessive force.  In the absence of a constitutional violation, qualified immunity attaches and Rhoads is entitled to summary judgment.

**B.    Defendant Tunnell's Motion for Summary Judgment**

As an initial matter, James cites to the case of <u>Spangler v. Wenninger</u>, 2010 U.S. App. LEXIS 16395 (6th Cir.), in his Reply Memorandum to Tunnell's Motion for Summary Judgment, arguing that the Sixth Circuit has already adjudicated this same claim and issue (doc. 59).   Notably, however, the <u>Spangler</u> case is patently different from the case before this Court, and James' reliance on the case is misguided.   In <u>Spangler</u>, officers knowingly destroyed personal and/or real property during the execution of a search warrant for a dead body.   Here, James makes no claims and presents no evidence that any of his property was destroyed, knowingly or unknowingly, during the search of his home (doc. 1).   Also, in <u>Spangler</u>, the plaintiff successfully established that the officers were actual and active participants in the unreasonable conduct. Here, James has failed to establish that Tunnell actually and/or actively participated in any unreasonable conduct.   <u>Spangler</u> offers James no assistance here.

James brings this action pursuant to 42 U.S.C. § 1983, alleging that Tunnell's conduct (namely Tunnell's supervision of, participation in, and approval of or acquiescence of the investigation) during the search of James' home constituted an unreasonable search and seizure that violated James' constitutional rights.   Summary judgment is appropriate at this time because the facts presented do not establish that Tunnell personally engaged in

or directed others to engage in, unreasonable conduct that amounted to an unreasonable execution of the valid search warrant.

When reviewing a Motion for Summary Judgment, in order to assess whether any triable issues of fact exist, the Court reviews the entire record, including the evidence presented by both sides, and, viewing the facts in the light most favorable to the non-moving party, the Court determines, based on the evidence presented, whether one party is entitled to judgment as a matter of law. Patton, 8 F.3d at 346; Anderson, 477 U.S. at 251-52. The summary judgment standard requires that the Court view disputed facts in the light most favorable to Plaintiff, which means that the Court, in reviewing the entire record, must draw all reasonable inferences in Plaintiff's favor. Matsushita, 475 U.S. at 587 ("On summary judgment the inferences to be drawn from the underlying facts... must be viewed in the light most favorable to the party opposing the motion"). However, a non-moving party cannot simply rest on their pleadings, and when the party fails to establish a material factual dispute by providing evidence beyond that set forth in the allegations in his pleadings, summary judgment for the moving party is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Clearly, the Court is under no duty to simply accept James' assertions and conclusory statements as true. If that were so, a court could never grant summary judgment to a defendant because every plaintiff could simply rest on his story.

-20-

James argues that several reasonable inferences can be made in his favor: (1) Tunnell, along with the other officers, was substantially prejudiced against James and participated in unconstitutional acts to punish James; (2) Tunnell encouraged, authorized, approved, or acquiesced in unconstitutional acts that occurred in James' home; and (3) such allegedly unconstitutional acts were conspicuous acts meant to embarrass and mock James (doc. 59). James argues that summary judgment is inappropriate and he is entitled to the reasonable inference that Tunnell is lying because Tunnell is biased towards James and trying to protect himself and the other officers (Id.). Notably, he offers no evidence of this alleged bias or prejudice.

In order to prevail on a 42 U.S.C. § 1983 claim, a plaintiff must allege (1) conduct by a person (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right. West v. Atkins, 487 U.S. 42, 48 (1988).  An individual defendant cannot be held liable when a plaintiff fails to show that the official was directly involved or caused the events at issue.  Petty v. County of Franklin, Ohio 478 F.3d 341, 349 (6th Cir. 2007).  Merely listing the names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983. Gilmore v. Corrections Corporation of America, 92 Fed. App'x 188 (6th Cir. 2004) (affirming dismissal of civil rights complaint,

filed pursuant to 42 U.S.C. § 1983, because plaintiff failed to indicate individual defendants violated his constitutional rights).

When a court evaluates whether a violation of a constitutional right has occurred, it is important for the court to evaluate the specific conduct that a complaining party alleges to be unconstitutional. <u>See</u> <u>United States v. Ramirez</u>, 523 U.S. 65, 71 (U.S. 1998). In cases regarding the Fourth Amendment and execution of warrants, the general test is whether the officer's actions were "reasonable." <u>Id.</u> Indeed, the execution of a warrant is governed by the general touchstone of reasonableness that applies to all Fourth Amendment analysis. <u>See</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-109 (2007).

Applying these principles to the facts at hand, the Court concludes that Tunnell did not violate James' constitutional rights. James simply does not adduce facts sufficient to overcome the facts presented in Tunnell's Motion for Summary Judgment. In James' Complaint, he claims that the search was unreasonable based on several alleged actions: (1) a mounted buck head was moved from one room to another and decorated with a clown hat and Christmas lights; (2) two videos depicting homosexual sex were removed from a hiding place in James' closet and left out on his bed; (3) a drawer next to James' bed was opened to reveal sex toys, which were activated so they were vibrating when James returned home; (4) a semi-automatic military gun was removed from its safe and left on

-22-

the floor; and (5) magazines and bullets were removed from storage and placed upright around the house (Id.).

However, when James refers to these specific actions in his Complaint, he generally references the possible actors by alleging that "while in James' home, the officers" collectively engaged in the alleged unconstitutional conduct. Consequently, James offers speculation and opinion rather than facts to support his specific allegations against Tunnell. James names Tunnel as a defendant; however, he has adduced no facts that demonstrate that Tunnell engaged in specific conduct that amounts to an unreasonable execution of the warrant.

The Court turns to the specific allegations in James' complaint.

### 1.   Claims Regarding Weapons and Ammunition

With respect to James' claim that ammunition and a weapon were seized from secure locations in the home, moved from the secure locations, and placed in different and unsecure locations in the home, James' Complaint suggests that the leaving of a weapon and ammunition in allegedly "unsecure" locations constituted an unreasonable search and seizure. The Court disagrees. Tunnell and the other officers were investigating allegations of illegal hunting and wildlife laws. Such a search necessarily involves a search for ammunition. Indeed, Judge Oney specifically provided that fired rifle ammunition was within the scope of the search

(doc. 53).  Further, Tunnell contends that he and the other officers attempted to return the items to their original locations, but the officers did not replace the semi-automatic gun because it was difficult to do so due to the gun's large size and resemblance to a machine gun (Id.).  Moreover, a reasonable officer, during a valid search warrant, may very well take ammunition out of stored locations to examine it and search for fired rounds or move weapons out of a safe.  Accepting as true that the semi-automatic gun was not returned to its safe and that some ammunition was moved from its previous location, such acts in no way rise to the level of a constitutional violation.  James has offered no support for such a dramatic extension of the protections of the Fourth Amendment—that failure to return items moved during a lawful search to their previous locations constitutes an unreasonable execution of the search.  On its own, the Court has been unable to find any such support.  To the extent James' claims rest on an assertion that his constitutional rights were violated when Tunnell failed to return the gun and ammunition—or failed to ensure that his officers do so—James' claims fail as he has not adduced evidence sufficient for a finding of a constitutional violation.

**2.  Claims Regarding Decoration of Animal Mounts**

With respect to James' claim that the officers placed several items of property including "a hat, Christmas lights, and goggles on deer antlers that were affixed to James' wall," Tunnell

contends that he did not move any such articles to decorate animal mounts nor directed anyone else to do this (doc. 53).  In fact, Tunnell recalls, and the "entry video" confirms, that some of the deer mounts were already decorated when the officers entered the house (Id.).  In fact, James acknowledges that the animal mounts had been previously decorated with various items (Id.).  Even if such items were moved and placed on different animal mounts, such actions do not amount to unreasonable police conduct.  In a search warrant where multiple animal mounts are seized and taken, it is reasonable that items placed on such mounts could be moved in the process of collecting the evidence.  In sum, to the extent that any animal mounts were decorated, James does not assert facts that Tunnell participated in the decoration of such mounts, nor does he adduce evidence sufficient to create a genuine issue of fact with respect to whether his Fourth Amendment rights were violated by officers moving decorations from one deer head to another.

### 3. Claims Regarding Pornographic Videos and Sexual Devices

With respect to James' claim that two pornographic tapes and three sexual devices were left out, Tunnell contends that he did not find and "leave out in the open" any pornographic videos, nor did Tunnell direct, authorize, or observe any other officer to engage in such conduct (Id.).  Tunnell notes, and James confirms, that the videos were not obviously labeled as to their content and that one would not know that the videos contained homosexual

-25-

pornography unless one viewed the videos (<u>Id.</u>).  Tunnell did ask
other officers to review and examine tapes, but such actions were
permitted by the warrant because illegal hunting activity is often
recorded and memorialized on various forms of media (<u>Id.</u>).  Thus,
moving and viewing tapes that are not overtly marked is not
unreasonable given the context of the authorization to search for
recorded evidence of illegal hunting activities.  James lacks facts
that demonstrate that the two tapes were purposely left out by any
officer.  Beyond that, James fails to demonstrate that Tunnell
himself left the tapes out or directed any officer to deliberately
do so.

Tunnell further maintains that he did not observe any
vibrators, turn them on and "leave them out," or direct any other
officer to do so (<u>Id.</u>).  Tunnell notes that while it is possible
items may be moved in a search, he would not handle items such as
the sexual devices due to health and safety concerns (<u>Id.</u>).  Again,
James lacks factual support that Tunnell turned on and left out
these devices or that Tunnell directed anyone else to do so.
Indeed, the entry/exit video clearly shows the state of James'
bedroom both before and after the search, and neither homosexual
video tapes nor vibrating sexual devices are visible.  The only
sexually-related material evident on the entry/exit video is a
stack of Playboy magazines on the bathtub rim and a blow-up doll,
and the video clearly shows that neither the magazines nor the doll

was disturbed during the search.

In sum, James has not demonstrated that any genuine material factual disputes exist such that this matter should proceed to trial. The facts do not support James' claims that Tunnell personally engaged in unreasonable conduct that deprived James of federal protected rights. Notably, during James' deposition, James conceded that he does not have evidence that Tunnell personally engaged in any of the conduct listed in the complaint (Id.). Instead, James argues that Tunnell is responsible for the alleged conduct that occurred during the search because Tunnell obtained the search warrant (Id.). Regardless, the facts simply do not demonstrate that Tunnell engaged in specific conduct that amounts to an unreasonable execution of the warrant, nor do the facts support an inference that Tunnell permitted his officers to engage in such conduct.

While the Court is sympathetic to James being upset that officers searched his home, albeit with a valid and lawful search warrant, there is simply insufficient evidence to support James' federal claims against Tunnell. No genuine issue of material fact exists with respect to whether Tunnel violated James' constitutional rights during the course of the ODNR's lawful inspection of James' home, and Tunnell is entitled to summary judgment.

**C.    Tunnell's Qualified Immunity Claim**

-27-

In Tunnell's Motion for Summary Judgment, Tunnell also argues that he is entitled to summary judgment because qualified immunity protects him.  The Court, however, need not address whether Tunnell has a valid qualified immunity argument because the Court grants Tunnell's Motion for Summary Judgment based on the reasons enumerated above.

## V.      Conclusion

No genuine issue of material fact exists with respect to whether either Defendant violated James' constitutional rights during the course of James' arrest or the search of James' home. Accordingly, for the reasons indicated herein, the Court GRANTS Defendants' Motions for Summary Judgment (docs. 43, 53 respectively).

SO ORDERED.


Dated: August 4, 2011          /s/ S. Arthur Spiegel

                               S. Arthur Spiegel
                               United States Senior District Judge